*In re* MARRIAGE OF WALTER LEE DeBOW, Petitioner and Counterrespondent-Appellee, and EARLINE DeBOW, Respondent and Counterpetitioner-Appellant.

Fifth District   No. 5—91—0221

Opinion filed November 10, 1992.

John T. Papa, of Pratt & Callis, P.C., of Granite City, for appellant.

John Baricevic, of Belleville, for appellee.

PRESIDING JUSTICE GOLDENHERSH delivered the opinion of the court:

Respondent/counterpetitioner, Earline DeBow (respondent), appeals from an order of the circuit court of St. Clair County distributing marital property and obligations between the parties. In this cause, respondent raises two issues: (1) whether the disposition and division of marital obligations and marital assets, namely a $3,400,000 judgment awarded to petitioner/counterrespondent, Walter Lee DeBow (petitioner), for injuries sustained after a beating by a fellow inmate during petitioner's incarceration in the East St. Louis city jail, was equitable and supported by the evidence, and (2) whether the child support award conforms to the requirements of section 505 of the Illinois Marriage and Dissolution of Marriage Act (the Act) (Ill. Rev. Stat. 1989, ch. 40, par. 505). We affirm in part, reverse in part, and remand with directions.

Respondent has filed a motion requesting we take judicial notice of a petition and order entered in *In re* Estate of Walter DeBow, a Disabled Person, St. Clair County No. 88—P—442. In that cause, the trial court entered an order on February 21, 1992, allowing the guardian, Richard DeBow, to remove petitioner herein from a treatment center and to provide care and housing at the guardian's own home. The court also allowed the request of the guardian for a monthly disbursement of $6,500 to pay petitioner's room, board, supervision and therapy. By an

order entered August 11, 1992, this amount was reduced to $4,000 per month, and a separate motion was filed to take judicial notice. Respondent asserts that in the interests of judicial fairness and economy, this court should take judicial notice of the foregoing proceedings because they constitute a substantial change in anticipated costs of caring for petitioner herein. Petitioner objects and responds that the proffered documents do not reflect the true intent of the trial court. Petitioner contends that in the event this court does take judicial notice of the aforementioned proceedings, we should review the entire transcript of the hearing on the petition for approval of expenditures, which was not originally tendered. Petitioner later filed a copy of the entire transcript and record in No. 88—P—442, and we have reviewed it.

■■ A trial court should take judicial notice of closely related proceedings. (See *Goad v. Evans* (1989), 191 Ill. App. 3d 283, 547 N.E.2d 690 (which held that the circuit court in a wrongful death action should have taken judicial notice of a letter of administration appointing the plaintiff administrator of her son's estate).) Judicial notice may be taken of factual evidence where the facts are capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy. (*People v. Davis* (1976), 65 Ill. 2d 157, 357 N.E.2d 792.) Judicial notice of other proceedings may be proper where the same parties are involved and the allegations from those proceedings have been proved. (*Walsh v. Union Oil Co.* (1972), 53 Ill. 2d 295, 291 N.E.2d 644.) Here, the order in No. 88—P—442, which was attached to respondent's motion, authorizes the requested change in petitioner's residence, as well as authorizes the $6,500 disbursement to his guardian. The record supports the order. For reasons later explained, we do not believe that these changes affect the disbursement of marital assets. Therefore, in the interest of judicial economy and the reasons stated above, this court grants respondent's motions to take judicial notice.

# I

Petitioner and respondent were married on July 21, 1975, but had lived together for approximately nine years prior to their marriage. The parties have two children, Pierre DeBow, born September 25, 1970, and Tamika DeBow, born February 1, 1979. On January 24, 1984, petitioner sustained injuries while he was being held in the East St. Louis city jail. On May 17, 1985, the estate of Walter DeBow was awarded a $3,400,000 jury verdict against the City of East St. Louis for petitioner's injuries. The judgment was affirmed by this court in *DeBow v. City of East St. Louis* (1987), 158 Ill. App. 3d 27, 510 N.E.2d 895.

At the time of petitioner's injury, the parties were married. Due to petitioner's injuries, respondent was appointed as guardian of the estate and person of petitioner. As such, she hired a law firm to represent her and her husband in their suit against East St. Louis and attended each day of the trial. Respondent was directly involved in making medical decisions for her husband during his hospitalization and subsequent rehabilitation. Respondent acted as guardian until April 30, 1986, when petitioner's brother and sister were substituted.

On January 19, 1988, petitioner, through his guardian, filed a petition seeking dissolution of marriage from respondent. After initially contesting the action, respondent filed a counterpetition seeking dissolution. The parties ultimately stipulated to grounds for dissolution and child custody. Respondent has custody of both children. At the time the action was filed, the only major marital asset was the $3,400,000 judgment against the City of East St. Louis. The parties stipulated that East St. Louis had agreed to periodic payments on the judgment. The payments are to be funded by a bond issue of July 1988, satisfied by a utility tax on power usage within East St. Louis. As of June 1, 1990, all scheduled payments had been met. The viability of the bonds, however, is questionable. Petitioner's attorney in the suit against East St. Louis, Clyde Kuehn, filed an affidavit in the instant proceedings. It stated, in pertinent part:

"2. These bonds as presently constituted, and given the financial reputation and condition of the City of East St. Louis[,] are virtually incapable of selling without a greater than fifty percent discount.

3. The structure of the bond, being dependent upon power usage of the businesses and residents of the City of East St. Louis, and being secondary to a prior bond issue[,] is extremely high risk.

4. The continued viability of the payment on this issue is tied not only to the financial improvement of the City of East St. Louis, but also to the decline in population and business enterprises within the corporate limits.

Any future payments in satisfaction of the bonds are necessarily dependent upon utility tax revenues that depend upon increased usage and/or increase in utility rates. A decline in population and/or business, and corresponding decline in power usage could reduce the revenue that is the sole source of bond commitment."

Testimony was presented on property and support issues. At the hearing, respondent testified that she attended 12th grade but did not

graduate. Since the beginning of her relationship with petitioner in 1966, respondent has had only minimal employment. She worked for McDonnell-Douglas in 1966 as a sheet metalist for a short period of time. In 1972, respondent was hired by Cordis Carburetor, where she worked for one month. Petitioner urged respondent to quit both jobs and stay at home. At present, respondent does not believe she can work 40 hours per week. Respondent stated that she suffers from allergies and asthma and frequently has attacks, which keep her awake and often require her to seek treatment at an emergency room. Respondent also complained of back and leg pain. No medical evidence was offered to support respondent's testimony concerning her physical infirmities.

Respondent testified that her monthly expenditures in 1989 included a rent payment of $425 per month and grocery bills of $400 per month. Respondent also had unspecified clothing, medical and dental expenses. At the time of the hearing, respondent's automobile needed a minimum of $500 in repairs. Since July 5, 1988, respondent has received $1,500 in monthly child support payments from petitioner's estate. Since January 1984, respondent and the parties' two children have received $321 per month in Social Security benefits. Respondent testified that since 1984, she has borrowed approximately $6,500 from friends and family to pay expenses incurred by her and her two children.

Pierre DeBow has a learning disability. At the time of the hearing he had not completed high school and was one year behind where he should have been. A *guardian ad litem* was appointed in this case to protect the children's rights. He opined that Pierre would be able to complete high school and care for himself. The *guardian ad litem* also found Tamika DeBow to be an excellent elementary school student. Respondent hopes Tamika will attend a private high school and later attend college. Both children want to maintain a relationship with petitioner.

Respondent testified that the parties have outstanding obligations which include the following:

| | |
|---|---|
| Bills while residing with petitioner prior to injury | $5,000.00 |
| Illinois Power | 400.00 |
| Illinois Bell | 345.00 |
| H.C. Crummery (bedroom furniture) | 1,200.00 |
| Health Spa | 160.00 |
| Avis Rental Car | 230.00 |

Respondent had outstanding legal fees totaling $4,815 for this and prior actions. Respondent does not have enough income to allow the children to visit petitioner in New Jersey, where he presently resides.

Petitioner has made progress since his injury. Initially, petitioner was in a coma. He subsequently regained consciousness and was transferred to a number of long-term care facilities. At the time of the hearing, respondent was being cared for at Independent Life Springs care facility in New Jersey. Since his transfer to New Jersey, respondent has made considerable progress. He is no longer confined to a wheel chair. He visited his brother's home, goes to shopping centers, walks, runs, and dances. He is able to conduct lengthy telephone conversations with respondent. Petitioner's main problem seems to be short-term memory loss. It was generally agreed that petitioner would need specialized care for the rest of his life. At the time of the hearing, petitioner's care at the New Jersey facility cost approximately $7,500 per month. Petitioner now resides with his guardian, and the estate disburses $4,000 per month to the guardian for petitioner's care.

There was testimony presented by petitioner's guardian at the hearing on the petition for approval of expenditures and change in residence that the cost of treating petitioner at Independent Life Springs had increased 80% over his four-year stay. Because of these increases, petitioner was not getting the rehabilitative and therapeutic treatment necessary for an even greater recovery. Petitioner's guardian wanted petitioner to move in with him, his wife and his stepson, so that the cost of petitioner's care could be stabilized. Petitioner anticipated that his family would receive approximately $15,000 per year out of the funds disbursed by the estate for petitioner's care. The remaining $60,000 would be spent on intensive therapy. Petitioner's guardian explained that the high cost of residential living in a facility such as Independent Life Springs is primarily due to around-the-clock supervision. With the guardian and the guardian's family providing 24-hour supervision, more money could be spent on intensive therapy, which petitioner did not get at Independent Life Springs.

The Illinois Department of Public Aid exercised a lien against petitioner's judgment for care provided to petitioner prior to his transfer to New Jersey. That lien has been satisfied from payments made by the city. Other medical expenses incurred by petitioner have also been paid. Forty percent of the payments made by the city on the judgment goes to the firm which represented petitioner's estate in the suit against the city. Costs associated with the instant litigation have also been satisfied by the estate.

The order from which respondent appeals was entered on March 7, 1991. In that order, the trial court incorrectly stated that petitioner had obtained a $4 million judgment against the City of East St. Louis.

The correct amount of this judgment is $3,400,000 as agreed by the parties. The trial court also found evidence that the City of East St. Louis "will be unable to meet the obligations of the judgment and the agreement entered into for the payment of the judgment." The trial court stated that even though the judgment was marital property, its main concern was that petitioner would receive all medical and rehabilitative treatment necessary to prepare him for a life independent of an institution. With petitioner's health being of primary importance, the trial court discussed the cost of his health care. At the time of the hearing, petitioner's stay at Independent Life Springs cost $260 per day. (By February 18, 1992, the date of the hearing on the petition for approval of expenditures and change in residence to the guardian's home, petitioner's stay at Independent Life Springs had increased to $325 per day.) The trial court then assumed that the annual inflation rate for health care would be 9% and further assumed petitioner would live to be 74 years old, making the total estimated cost for his care and treatment $6,598,571, barring any significant medical complications. Given the speculative nature of any future payments by the city and the court's emphasis on the well-being of petitioner, the court directed payment as follows:

"a) That the sum of ONE THOUSAND FIVE HUNDRED DOLLARS ($1,500.00) previously awarded as temporary child support is to continue as present support and petitioner/counter-respondent is ordered to make said payments during the minority of the children or when they complete high school, whichever occurs later.

b) That there be no distribution between the parties during the first 5 years when the Judgment bonds shall become due, or when the Guardian has accumulated a cash reserve of $500,000.00, whichever occurs later, but rather they should be paid directly to the petitioner/counter-respondent's guardian to be placed in trust for his medical and rehabilitation needs. This would allow a sufficient reserve to build up so that the petitioner/counter-respondent's needs would be satisfied for not only the present, but also for a sufficient time in the future.

c) That commencing on 7/1/93 or whenever the cash reserve of $500,000.00 has been accumulated, whichever occurs later, and following each and every year thereafter, the first 50% of said proceeds (after attorney's fees and costs) would be paid directly to the petitioner/counter-respondent's Guardian so that the trust fund could remain ongoing. The balance of said funds

shall then be split equally between the parties within 30 days that said bonds are due.

d) That if at any time the funds accumulated for the medical care and need of the petitioner/counter-respondent fall below the sum of $500,000.00, all distribution of the funds shall cease, and there shall be no distribution between the parties until cash reserve is built up to the level of $500,000.00. Upon attaining that level, distribution shall be in accordance with paragraph (c)."

Petitioner appeals from the trial court's order.

## II

The first issue we are asked to address is whether the disposition and division of marital assets, namely the $3,400,000 judgment, and marital obligations were equitable and supported by the evidence. Respondent contends that the trial court abused its discretion in determining that petitioner's well-being took precedence over support considerations. Respondent argues that "there is absolutely no support in the record to establish a cash reserve of $500,000.00 in the estate account or to delay any distribution of the marital asset until July 1, 1993, or beyond." According to respondent, this distribution scheme punishes her and her children when they have committed no offense. We disagree.

■■ The parties agree that the $3,400,000 judgment is marital property. (*In re Marriage of Burt* (1986), 144 Ill. App. 3d 177, 494 N.E.2d 868.) The only question is whether the trial court made a proper distribution of this asset between the parties. The distribution of marital assets is left to the sound discretion of the trial court. (*Atkinson v. Atkinson* (1981), 87 Ill. 2d 174, 180, 429 N.E.2d 465, 468; *In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017, 1019, 471 N.E.2d 1008, 1012; *In re Marriage of Hilkovitch* (1984), 124 Ill. App. 3d 401, 414, 464 N.E.2d 795, 802-03.) An abuse of discretion in distributing marital assets upon dissolution occurs only when a court so exceeds the bounds of reason that no reasonable person would take the view the court adopted. *In re Marriage of Click* (1988), 169 Ill. App. 3d 48, 57, 523 N.E.2d 169, 175; *Hilkovitch*, 124 Ill. App. 3d at 414, 464 N.E.2d at 803.

Section 503(d) of the Act expressly directs the trial court to take into consideration the following relevant factors when dividing marital property:

"(1) the contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation in value, of

the marital and non-marital property, including the contribution of a spouse as a homemaker or to the family unit;

(2) the value of the property set apart to each spouse;

(3) the duration of the marriage;

(4) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children;

(5) any obligations and rights arising from a prior marriage of either party;

(6) any antenuptial agreement of the parties;

(7) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(8) the custodial provisions for any children;

(9) whether the apportionment is in lieu of or in addition to maintenance;

(10) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

(11) the tax consequences of the property division upon the respective economic circumstances of the parties." (Ill. Rev. Stat. 1989, ch. 40, pars. 503(d)(1) through (d)(11).)

In *In re Marriage of Burt* (1986), 144 Ill. App. 3d 177, 494 N.E.2d 868, our colleagues in the Fourth District Appellate Court faced nearly the same challenge we face here. In *Burt*, the husband obtained a structured settlement of $230,000 for a personal injury claim resulting from an automobile accident during pendency of the parties' divorce proceedings. The trial court found that the settlement was marital property. The *Burt* court agreed and went on to find that the trial court did not abuse its discretion in distributing the proceeds of the settlement. A portion of the settlement consisted of furnishing the petitioner with an annuity of slightly more than $3,400 per month to be paid to him beginning on his 65th birthday, some 20 years in the future. The annuity had a present cash value of $55,000. (144 Ill. App. 3d at 178-79, 494 N.E.2d at 869.) The *Burt* court agreed with the trial court that the wife "should have a one-half interest in the value of the annuity and one-half of the cash balance of the settlement, which balance, together with interest, then totaled $49,279.82." (144 Ill. App. 3d at 179, 494 N.E.2d at 869.) To effectuate this decision, the court ordered the petitioner to pay the respondent the sum of $52,139.91. The *Burt* court affirmed the settlement, finding that the

trial court had to choose between attempting to make the petitioner whole for his pain and suffering and making sure the petitioner's family would be taken care of properly because there was not enough money to do both. In such a situation, the *Burt* court determined that support considerations should predominate. (144 Ill. App. 3d at 183, 494 N.E.2d at 872.) The *Burt* court did find, however, that a court is authorized to consider the disability of the injured spouse and accordingly award more to the disabled spouse. Specifically, the *Burt* court noted:

> "By the terms of section 503(d), in dividing marital property, the court is expressly directed to consider 'the age, health, *** employability, *** and needs of each of the parties' (Ill. Rev. Stat. 1983, ch. 40, par. 503(d)(7)) together with the opportunity of a spouse to secure future income (Ill. Rev. Stat. 1983, ch. 40, par. 503(d)(10)). This, of itself, authorizes the court to consider the disability of an injured spouse and award a larger portion of marital property, including proceeds of a cause of action to that spouse. Moreover, the factors expressed in section 503(d) are not the only factors that can be considered. Other factors may be considered if relevant. (*Atkinson v. Atkinson* (1981), 87 Ill. 2d 174, 429 N.E.2d 465; Ill. Ann. Stat., ch. 40, par. 503, Historical & Practice Notes, at 61 (Smith-Hurd Supp. 1986).) The pain and suffering and disability of an injured spouse would be relevant considerations." *Burt*, 144 Ill. App. 3d at 182, 494 N.E.2d at 871.

■ In the present case, the trial court's main concern was "to insure that *** petitioner *** receive all the medical and rehabilitative care and treatment necessary not only to treat him for the permanent injuries that he sustained but to prepare him, to the greatest extent available, for life as independent from an institutionalized setting as possible." This is a legitimate concern, as acknowledged not only by the *Burt* court but by several others. (See *In re Marriage of Click* (1988), 169 Ill. App. 3d 48, 57-58, 523 N.E.2d 169, 175; *In re Marriage of Fuggiti* (1985), 130 Ill. App. 3d 190, 474 N.E.2d 386; *In re Marriage of Clearman* (1981), 97 Ill. App. 3d 641, 423 N.E.2d 283.) To reach this goal, the trial court, first, ordered payment of fees to the law firm which represented petitioner in his personal injury action; second, ordered that the temporary child support award of $1,500 per month be made permanent; third, ordered that there be no distribution between the parties during the first five years when the bonds become due or until a cash reserve of $500,000 be accumulated, whichever occurred later, in order to build up a sufficient reserve to

ensure petitioner's needs be satisfied now and in the future; and, finally, ordered that beginning on July 1, 1993, or when a $500,000 reserve has accumulated, whichever occurred later, and every year thereafter the first 50% of the proceeds of the judgment be paid to petitioner's guardian to ensure that the trust remains ongoing and the remaining 50% be split between petitioner and respondent. In short, this order requires that after attorney fees and child support are paid, the remaining money be split between the parties at a rate of 75% for petitioner and 25% for respondent. This division will not occur, however, until a cash reserve of at least $500,000 is on hand in order to ensure that petitioner's needs will be met now and in the future. Respondent apparently does not contest the actual percentages awarded to the parties but contends that this imposed gap in her receipt of support is unwarranted because it is not clear that the city will be unable to meet its payments to petitioner as scheduled. We disagree.

Respondent asks us to take judicial notice of an order entered in a separate probate matter which allowed petitioner's guardian to remove petitioner from Independent Life Springs treatment center and care for petitioner at home. For reasons previously stated, we have agreed to take judicial notice of the order and the record in No. 88—P—442. (For additional authority, see *Seniuta v. Seniuta* (1975), 31 Ill. App. 3d 408, 334 N.E.2d 261, where, in a divorce action, the court took judicial notice that there had been mortgage foreclosures on the husband's properties.) Likewise, we will take judicial notice of our own recently entered opinion in *Estate of DeBow v. City of East St. Louis* (1992), 228 Ill. App. 3d 437, 592 N.E.2d 1137, *appeal allowed* (1992), 146 Ill. 2d 626, in which the financial difficulties of the city and their effect on obligations owed petitioner were noted. Petitioner's attorney in his suit against the city filed an affidavit in the instant case which states that, because of the financial condition and reputation of the city, the bonds "are virtually incapable of selling without a greater than 50% percent discount" and that the bonds are extremely high risk. The attorney pointed out that continued viability of payment to petitioner is tied not only to the financial improvement of the city but also to the population of residents and businesses within the corporate limits. We believe it is clear that the city has been unable to meet its payments to petitioner as scheduled, and that it is likely the city will continue to have difficulty meeting its obligations to petitioner.

## III

■ Respondent next contends that the trial court's order is in error because no disposition was made concerning the marital obligations existing at the time petitioner was injured or expenses incurred by the family thereafter. A review of the record, however, reveals that the evidence presented to substantiate the amounts owed was less than convincing. The only evidence presented concerning marital obligations was through the testimony of respondent herself. The following is the colloquy which ensued between respondent and her attorney concerning marital debts of the parties:

"Q. Do you have bills that you have accumulated over the past? Do you owe money to people now, loans or things of that sort?

A. Yes, I do. I owe all kinds of loans. I owe one brother of mine $800.

Q. What is his name?

A. J-e-r-e—Jeremiah.

Q. All right. And, do you owe him $800?

A. Yes.

Q. Okay. Who else?

A. I owe Ruby Baker.

Q. How much do you owe Ruby?

A. Four hundred.

Q. Anyone else?

A. Shannie Coleman.

Q. Is that your sister?

A. Yes.

Q. How much do you owe her?

A. Three hundred.

Q. And, were these loans for living expenses?

A. Yes and car repairs.

Q. Okay. Anything else, anybody else that you owe money to?

A. Avis, two-thirty.

Q. What is Avis?

A. My car.

Q. All right. Again, is that for living expenses in the past?

A. I had to pay my utility bill, yes, last week.

Q. Anyone else that you owe money to?

A. Well, we have some bills that Walter and I accumulated some bills together. I tried to get an apartment last year in

North County, and they do a credit check. When they did the credit check, they came up with approximately $5,000 worth of was U.E., Pleasant Hollow.

Q. What is Pleasant Hollow?

A. Pleasant Hollow is—we were leasing a house in Pleasant Hollow. And, as a matter of fact, I went into a savings of my two older children, which their father is deceased and left them an insurance of $10,000, and when we were together living in Pleasant Hollow I went into their account at his request. I kept getting behind in the house note. I went into their account and practically drained it of paying—of bringing up the house notes when he would not pay them himself.

Q. How much was borrowed from your older children then?

A. $5,000 and I do have some receipts.

Q. And, now the bills that you said showed up on your credit report, these were bills incurred during the time that you and Walter were living together before the accident.

A. That's correct.

Q. Okay. And that amounted to about $5,000.

A. That's right.

Q. And, in addition to that there is about $5,000 that came out of your older children's savings accounts?

A. Yes.

Q. Do you owe any bills to anybody else, like companies or utilities or things of that sort?

A. I owe Bell Telephone $345.

Q. Anyone else?

A. One of my own to a health spa.

Q. Okay. And, how much is owed there?

A. Approximately $160. I'm not sure on that one.

Q. Okay. Any other bills outstanding right now of any kind that we have not talked about or any money owed to anybody or any company that we haven't talked about?

A. I bought a bedroom suite.

Q. And, how much is owed on the bedroom?

A. Including the bedding is twelve hundred.

Q. And, whom is that owed to?

A. I think it's H.C. Crummery."

No receipts or bills were introduced into evidence to substantiate the claims made by respondent concerning marital obligations. It is the function of the trial court to assess the credibility of the witnesses and determine the weight to be afforded their testimony. (*In re Marriage of*

*Click*, 169 Ill. App. 3d at 57, 523 N.E.2d at 175.) Based upon the record before us, we cannot say that the trial court abused its discretion in not awarding respondent the amounts she claimed were owed.

Respondent also complains that the trial court failed to make a finding concerning medical expenses incurred by petitioner prior to his transfer to New Jersey. However, respondent's own statement of facts states that the medical expenses incurred by petitioner have been satisfied in full. After an examination of these amounts, we find them to be reasonable and find no error in the trial court's failure to include a discussion of these payments in its order.

## IV

■ Finally, we must consider whether petitioner's removal from the New Jersey treatment center to his guardian's home and corresponding reduction in monthly expenses constitute "a substantial change in the anticipated costs of caring for Walter DeBow," as argued by respondent. We do not believe that the order entered in *In re* Estate of Walter DeBow, a Disabled Person, St. Clair County No. 88—P—442, which allowed these changes, necessitates a change in the trial court's order.

Caring for petitioner at his New Jersey treatment center cost, on the average, $7,500 per month, while the costs of keeping petitioner at his guardian's home will cost $4,000 per month. The costs of keeping petitioner at Independent Life Springs had increased 80% over a four-year period. It is encouraging that petitioner is at this time doing well enough to be transferred from Independent Life Springs to his brother's home. Nevertheless, there has been no evidence presented that petitioner will not need continued therapy and treatment, at least on an outpatient basis, or that respondent will never again need to be placed in a facility such as Independent Life Springs. Instead, the evidence presented showed that petitioner would receive more intensive therapy with his change in residence, which would allow him to recover more fully. Without more evidence that this new living arrangement is permanent or that petitioner has so greatly improved that he will not need continued treatment and therapy, we do not conclude that the trial court's order is erroneous.

The trial court correctly considered petitioner's disability and took into account financial difficulties facing the City of East St. Louis. The requirement that $500,000 must accumulate in petitioner's account before any support payments are made to respondent is justified. Based upon the record before us, we cannot say that the trial court so exceeded the bounds of reason that no reasonable person would take the view it adopted. *In re Marriage of Click*, 169 Ill. App. 3d at 57,

523 N.E.2d at 175; *In re Marriage of Hilkovitch,* 124 Ill. App. 3d at 414, 464 N.E.2d at 803.

## V

The other issue we are asked to address is whether the child support award made by the trial court conforms to statutory requirements found in section 505 of the Act. (Ill. Rev. Stat. 1989, ch. 40, par. 505.) Respondent argues that the trial court failed to comply with the requirements of section 505 by failing to state upon what evidence the order was based. Using her own computations, respondent contends that the trial court's award of $1,500 per month for child support is only 17% of petitioner's net income and, therefore, does not comply with section 505 of the Act, which requires that 25% of the supporting party's net income be paid for child support for two children unless the court finds a reason for deviating from the guidelines. (Ill. Rev. Stat. 1989, ch. 40, par. 505.) Petitioner responds that the trial court's order does conform to the requirements of section 505 of the Act because it clearly states a reason for deviation from the 25% guideline, namely, the trial court's overriding concern for the care of petitioner. Petitioner claims that $1,500 per month meets the needs of the children and the order should be affirmed. We agree with respondent that the trial court's order with regard to child support was inadequate.

Section 505 of the Act governs the trial court's award of child support. (Ill. Rev. Stat. 1987, ch. 40, par. 505.) It provides that the court is to determine the minimum amount of support by using a set of guidelines. (Ill. Rev. Stat. 1989, ch. 40, par. 505(a)(1).) These guidelines provide that for two children, the supporting party is to contribute 25% of his or her net income as and for those children's support. (Ill. Rev. Stat. 1989, ch. 40, par. 505(a)(1).) The section further provides:

"(2) The above guidelines shall be applied in each case unless the court, after considering evidence presented on all relevant factors, finds a reason for deviating from the guidelines. ***

\* \* \*

If the court orders a lower award, based on consideration of the factors in paragraphs (2)(a) through (2)(e) of subsection (a) of this Section, it shall make express findings as to its reason for doing so. The guidelines may be exceeded by the court without express findings, or by agreement of the parties." (Ill. Rev. Stat. 1989, ch. 40, par. 505(a)(2).)

Relevant factors to be considered include the following:

"(a) the financial resources of the child;

(b) the financial resources and needs of the custodial parent;

(c) the standard of living the child would have enjoyed had the marriage not been dissolved;

(d) the physical and emotional condition of the child, and his educational needs; and

(e) the financial resources and needs of the non-custodial parent." (Ill. Rev. Stat. 1989, ch. 40, par. 505(a)(2).)

The language of the statute and the cases interpreting section 505 indicate that the trial court must make express findings when ordering an award lower than the award set forth in the guidelines. *In re Marriage of Wright* (1991), 212 Ill. App. 3d 392, 571 N.E.2d 197; *In re Marriage of Harding* (1989), 189 Ill. App. 3d 663, 545 N.E.2d 459.

■ Here, we do not believe that the trial court met the express requirements of the Act. In its order, the trial court stated that its main concern was petitioner's medical needs. A review of the record and the order does not, however, disclose that the trial court took into consideration any of the other factors listed within section 505. A *guardian ad litem* was appointed to protect the needs of the minor children. The *guardian ad litem* indicated that Pierre DeBow had some special educational needs which the trial court failed to address in its order. The trial court made permanent the $1,500 temporary award of child support awarded in the related probate matter without making the specific findings of fact necessary to order a lower award than suggested in the guidelines of section 505.

Since the trial court did not meet the statutory guidelines of section 505 in that it failed to award the appropriate 25% of petitioner's net income without giving an adequate explanation in the order as to why a deviation from the statutory percentage is justified, we must reverse that portion of the order awarding respondent $1,500 per month in child support. We remand with directions to the trial court to consider the factors expressed in section 505 of the Act and, if an award lower than 25% of petitioner's net income is warranted, give express reasons for the deviation. See *In re Marriage of Harding* (1989), 189 Ill. App. 3d 663, 545 N.E.2d 459.

For the foregoing reasons, the order of the circuit court of St. Clair County is affirmed in part and reversed in part and the cause is remanded with directions.

Affirmed in part, reversed in part, and remanded with directions.

H. LEWIS and CHAPMAN, JJ., concur.