THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. COREY JACKSON, Defendant-Appellant.

First District (2nd Division)    No. 1—00—0378

Opinion filed May 14, 2002.

Rita A. Fry, Public Defender, of Chicago (Denise R. Avant, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Joan F. Frazier, and Mary Jo Murtaugh, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

Following a jury trial, defendant Corey Jackson was convicted of two counts of aggravated criminal sexual assault with a weapon and one count of aggravated kidnaping and was sentenced to consecutive prison terms of eight, seven and six years, respectively. On appeal, defendant contends that his convictions and sentences should be vacated because: (1) the trial court erred in admitting other crimes evidence to show defendant's *modus operandi*; (2) the trial court improperly refused to tender defendant's non-pattern jury instruction defining *modus operandi*; (3) defendant was improperly convicted of aggravated kidnaping when the aggravated kidnaping was incidental to the sexual assault; and (4) the trial court improperly considered defendant's failure to admit his guilt or show remorse in imposing sentence. We reverse and remand.

## BACKGROUND

Prior to the commencement of defendant's trial, the State moved to present evidence of other crimes to establish defendant's *modus operandi*. The State argued that defendant was previously convicted of sexually assaulting L.S. and that there were many similarities between the assault against L.S. and the assault against D.R., the victim in the instant case. Specifically, the State argued that the profiles of the victims chosen by defendant were similar because D.R. and L.S. were both African-American, adult females who were alike in age insofar as D.R. was 39 years old and L.S. was 33 years old. The State further argued that the crimes were similar because defendant was a stranger to both victims, acted alone in committing both offenses, took

both victims to abandoned buildings, engaged in vaginal sex with both victims and ejaculated during both offenses. Although defendant used a gun when assaulting D.R. and a knife when assaulting L.S., he nevertheless used a weapon in both instances. Further, defendant kidnaped both victims by dragging L.S. into a nearby abandoned building and forcing D.R. into his vehicle and driving her several blocks to a different abandoned building. Finally, the State argued that the offenses were similar because Nautica apparel was involved in both offenses in that defendant stole L.S.'s Nautica coat after assaulting her and was wearing a Nautica coat while assaulting D.R. Notably, the State did not present any evidence at trial which established that the Nautica coat worn during D.R.'s assault was the same coat stolen from L.S.

Defendant argued that the evidence was insufficient to establish *modus operandi* because it was "not probative or significant enough to earmark this work as being the signature of Corey Jackson." Defendant asserted that there were several sex offenders on the south side of Chicago who used abandoned buildings and weapons to assault African-American, adult females. Defendant also pointed out that the abandoned buildings used in this case were miles apart, in different neighborhoods, and that there was no connection established between him and the buildings. Further, defendant argued that different weapons were used in each offense and that the offender approached and kidnaped the victims in a different manner. Defendant also asserted that vaginal penetration was an element of the crime charged and that this evidence did not support the State's *modus operandi* argument. Finally, defendant argued that the State's argument concerning Nautica clothing was a "red herring" because "[t]here are 3-million people in the City of Chicago with access to Nautica clothing."

The trial court concluded that there were "eight strikingly similar points of comparison" between these offenses, namely: (1) that the victims in each case were abducted on the street on the south side of Chicago; (2) each abduction occurred in "hours of darkness"; (3) the assailant was a stranger to the victims; (4) vaginal sex acts occurred in both cases; (5) the assailant used a weapon; (6) the assailant acted alone; (7) the victim was alone when she was abducted and assaulted; and (8) Nautica clothing was involved in both offenses.

The following testimony was presented at trial. D.R. stated that she was 39 years old on May 25, 1998, the date of the instant offense, and was living in the area of 48th and Indiana Streets in Chicago. Although she was unemployed at the time, she was not working as a prostitute. At approximately 10:45 p.m. on the date in question, D.R.

was walking towards the area of 50th and Indiana Streets when a man approached and asked if he could accompany her. When D.R. refused, the man, whom D.R. identified as defendant, placed his gun against the left side of her rib cage and told her to get into his car. D.R. testified that defendant was alone and that he was a stranger to her.

D.R. explained that she got into defendant's car and he drove her to an abandoned building located at 88th and Dauphin Streets. Defendant took D.R. inside the abandoned building and told her to undress. He then forced D.R. to engage in acts of oral and vaginal sex. When the acts were completed, defendant told D.R. to wait four minutes before leaving the building. He then dressed himself and left. According to D.R., defendant was wearing "a baseball cap, a Nautica jacket, a [T]-shirt, some jeans and some tennis shoes" at this time. After defendant left, D.R. dressed and ran out of the building. She was eventually picked up by two women who drove her to the police station.

Officer Percy Alexander testified that he spoke with D.R. at the police station after the assault. D.R. directed him to a second-floor apartment located in an abandoned building at 8800 South Dauphin and identified the apartment as the scene of the assault. Officer Alexander averred that the apartment was obviously vacant and that debris was strewn throughout.

The State subsequently called L.S. as a witness. Prior to her testifying, defendant requested that the trial court instruct the jury on the proper manner of considering other crimes evidence by inserting the term *modus operandi* into Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 3.14). The trial court agreed and instructed the jury as follows:

"Members of the jury, before this witness testifies, I must instruct you that through [L.S.], evidence will be received that the defendant, Mr. Jackson, has been involved in conduct other than that charged in the indictment. This evidence will be received on the issue of the Defendant's modus operandi, and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in that conduct, and if so, what weight should be given to this forthcoming evidence on the issue of modus operandi."

Defendant also requested that the trial court give the jury a non-IPI instruction tendered by defense counsel which defined *modus operandi* based on the definition set forth in Black's Law Dictionary 1020 (7th ed. 1999) and *People v. Kimbrough*, 138 Ill. App. 3d 481, 486, 485 N.E.2d 1292, 1297 (1985). Defendant's tendered instruction read: "MODUS OPERANDI refers to a pattern of behavior so distinct that

separate acts or conduct are recognized as the work of the same person." The trial court declined to tender this instruction to the jury. In making this decision, the trial court stated:

"The IPI recognize[s] that any non-IPI given to the jury *** should be as to the law and should not be argumentative or segment. A certain rule of law, which could lead the jury to be confused or be mislead [sic]. And I think by giving the definition of MO [modus operandi] as it appears in People versus Kimble [sic], could lead to jury confusion. Given the fact that IPI 314 [sic] contains a very plain and distinct definition of proof of evidence of other crimes."

L.S. subsequently testified that she was walking in the area of 64th and Hermitage Streets at about 4 a.m. on September 26, 1998, when defendant jumped out of the bushes and grabbed her by the hood of her Nautica coat. Defendant, carrying a long cake knife, pulled L.S. into an abandoned building located nearby, and with his hands around her neck, dragged her to the second floor of the building in the living room part of the house. According to L.S., the living room was dirty and there was a blanket spread out in the corner of the room. L.S. explained that defendant got on top of her, pulled off her pants and coat, vaginally penetrated her and ejaculated. L.S. stated that she was kicking and struggling throughout the assault and lost one of her shoes as a result. Nevertheless, she was unable to fend off defendant. When the assault was over, defendant got up and began swinging his knife at L.S. She averred that she blocked the knife with her hand and sustained a cut to her finger. She then got up and ran out of the building. L.S. explained that she was 33 years old at the time of the assault. She denied knowing defendant prior to the assault or working as a prostitute.

Officer Possada testified that he spoke to L.S. after the assault and then went to the abandoned building located at 6457 South Hermitage where the assault allegedly occurred. He observed debris scattered throughout the building and found L.S.'s shoe, as well as a blanket on the floor. According to Officer Possada, defendant was picked up by other patrol officers in the area shortly thereafter and brought back to the abandoned building. L.S. identified defendant at that time.

The parties then stipulated that a vaginal swab taken from D.R. at the hospital tested positive for semen and that the swab was sent to a forensic scientist for DNA testing. Likewise, blood was drawn from defendant and the blood sample was forwarded to the same forensic scientist. DNA analysis established that the mixture of DNA on the swab was consistent with having originated from D.R. and defendant.

Defendant testified on his own behalf. He stated that he lived at 2438 West 63rd Street in Chicago in 1998 at the time of the assaults

in question. During that time period, he was in the habit of going to 47th or 63rd Street two to three times per week to "buy sex" from prostitutes. Defendant explained that he would pay the prostitutes $10 and then have sex with them in backyards or gangways. Defendant asserted that, prior to March 25, 1998, he had purchased sex from D.R. more than five times, and on the night in question, he met D.R. in the area of 49th and Prairie and paid her $10 in exchange for vaginal sex. Afterwards, D.R. demanded $50 from defendant in addition to the $10 he had already paid her. Defendant stated that he refused to pay the extra money and D.R. told him that she would "fix" him. At that point, defendant left D.R. and walked to 49th and King Drive to get a cab. Defendant denied engaging in oral sex with D.R. and denied driving her to 88th and Dauphin.

Defendant testified that he similarly met L.S. in the area of 62nd and Ashland at about 1:30 a.m. on September 26, 1998. Defendant had a conversation with L.S. and then she asked him if she could "sell him sex." Defendant agreed and he and L.S. went to a nearby hotel where L.S. had previously rented a room. Defendant paid L.S. $10 and they engaged in both oral and vaginal sex. At some point in their encounter, L.S. told defendant that she was selling her coat and defendant agreed to buy it for $20. After having intercourse with L.S., defendant took the coat and left the hotel room. He went across the street to a sandwich shop and ate. After about 45 minutes, defendant encountered L.S. again in the same area. He agreed to pay her for sex a second time and gave her $10. According to defendant, L.S. led him to an abandoned building at 65th and Hermitage. Defendant explained that he was frightened of the abandoned building and did not want to go inside, but L.S. assured him that she often went there to "turn dates and get high." Defendant nevertheless refused to accompany L.S. inside the building and requested his money back. When L.S. refused to refund his money, defendant took the money out of her hand and left.

The parties then stipulated that, if called to testify, a doctor would state that he examined L.S. on September 26, 1998, and took a swab of her vaginal area. He did not observe any signs of trauma to L.S.'s pelvic area or body. L.S. did not complain of injuries or pain and he did not treat a cut on her finger.

Thereafter, the parties proceeded to closing arguments. The State made the following remarks concerning defendant's *modus operandi*:

"Counsel said in his closing argument all of a sudden D.R. is abducted from 48th and Indiana and taken to an abandoned building. Why not a garage? Why not an alley? Why? Because that's not defendant's M.O. That's not Corey Jackson's modus operandi. What

is his M.O.? What is his modus operandi? Well, Mr. Jackson works in the darkness. He works on the south side. He waits until he sees a woman walking alone. He is by himself. He is armed with a deadly weapon. It's either a gun, as in [D.R.'s] case, or a knife as in [L.S.'s] case. *** Again, going back to that modus operandi; he works on the south side and he takes these women to abandoned buildings, not garages but abandoned buildings. What's that profile of the victim that he attacks, that he preys upon? Take a look at the two women that you heard from in this case, [D.R.] and [L.S.] and look at the similarities in those women. Both of the women are, in fact, adults. They are both female, [A]frican [A]mericans and both very close in age, approximately six years difference in age. *** Once he takes them to [t]he abandoned building, remember that testimony, each victim said that they were taken to the corner of the room. Again, that's part of his M.O. What type of sex does he have in both cases? Vaginal sex. And in both cases he ejaculates."

After summations, the trial court instructed the jury, and specifically reinstructed them on the issue of *modus operandi* evidence in accordance with IPI Criminal 4th No. 3.14.

## ANALYSIS

### Improper Admission of Other Crimes Evidence

On appeal, defendant contends that the trial court erred in admitting L.S.'s testimony to establish *modus operandi* because the similarities between the assault on L.S. and the assault on D.R. were generic and failed to show a "signature trait" that marked defendant as the perpetrator of each offense. In the alternative, defendant asserts that, should we conclude that the other crimes evidence was properly admitted under the *modus operandi* exception, the evidence nevertheless should have been excluded because it was more prejudicial than probative, and its prejudicial effect was heightened by the State's use of this evidence in closing arguments.

In response, the State argues that a "signature trait" is not required for *modus operandi* evidence to be admissible; the only requirement is that the similarities between the offenses outweigh the dissimilarities. The State argues that this showing was adequately made in the instant case because eight identical traits between the crimes were established. Finally, the State contends that the jury received a limiting instruction concerning *modus operandi* evidence and that the instruction reduced any prejudicial effect of the evidence. We disagree with the State's contentions.

■ Evidence of other crimes is admissible where relevant to prove *modus operandi*, intent, identity, motive or absence of mistake. *People*

*v. Robinson,* 167 Ill. 2d 53, 62-63, 656 N.E.2d 1090, 1094 (1995). However, other crimes evidence is not admissible where it is more prejudicial than probative, offered to show the defendant's propensity to commit a crime or used to bolster the testimony of a victim or other prosecution witness. *Robinson,* 167 Ill. 2d at 62, 656 N.E.2d at 1094; *People v. Luczak,* 306 Ill. App. 3d 319, 327, 714 N.E.2d 995, 1001 (1999). A trial court's ruling on the admissibility of other crimes evidence will not be reversed absent a clear abuse of discretion. *People v. Kliner,* 185 Ill. 2d 81, 146, 705 N.E.2d 850, 883 (1998).

> "The *modus operandi* or 'method of working' exception refers to a pattern of criminal behavior so distinct that separate offenses are recognized as the work of the same person. [Citation.] Between the offense offered to prove *modus operandi* and the offense charged, there must be a clear connection which creates a logical inference that, if defendant committed the former offense, he also committed the latter. [Citation.] This inference arises when both crimes share peculiar and distinctive features not shared by most offenses of the same type and which, therefore, earmark the offenses as one person's handiwork. [Citation.] The offenses need not be identical but must share features which, although common to similar crimes in general, are distinctive when considered together." *People v. Berry,* 244 Ill. App. 3d 14, 21, 613 N.E.2d 1126, 1132 (1991).

The State argues that sufficient similarities existed between the offense against L.S. and the instant offense to trigger the *modus operandi* exception. Specifically, the victims were both adult, African-American females of similar age who were walking alone when accosted. The assaults took place within a four-month period of each other on the south side of Chicago while it was dark outside and both victims were kidnaped and taken to "filthy" abandoned buildings. Additionally, defendant was a stranger to both victims, acted alone in each case, used a weapon, forced the victims to have vaginal intercourse and ejaculated. Finally, defendant attacked L.S. while she was wearing a Nautica coat and took the coat from her; likewise, defendant wore a Nautica coat when assaulting D.R.

The State relies on our supreme court's holding in *People v. Jones,* 156 Ill. 2d 225, 620 N.E.2d 325 (1993), to support its contention that evidence of defendant's *modus operandi* was properly admitted. The *Jones* court reasoned that admission of other crimes evidence through the *modus operandi* exception was proper because the sexual assaults committed against two victims, Smith and B.B., "had enough similarities that a judge, in his discretion, could conclude that the B.B. rape demonstrated a pattern or 'signature,' rendering evidence of that rape probative of the *modus operandi* used by Smith's assailant." *Jones,*

156 Ill. 2d at 240, 620 N.E.2d at 331. The court noted the following similarities between the offenses: both victims were single, African-American women in their late twenties; both assaults occurred at about 3:30 a.m. on Sunday morning during the spring of 1985; the assaults were committed three months apart, less than two blocks away from each other in an area where the defendant had lived most of his life; and the women were assaulted on the first floor of an abandoned building, were struck in the face, had their clothing removed forcibly and were assaulted at knifepoint. *Jones*, 156 Ill. 2d at 240, 620 N.E.2d at 331.

*Jones*, however, is inapposite to the case at bar. Unlike the victims in *Jones*, the victims in the instant case were not in the same age group insofar as L.S. was in her early thirties and D.R. was nearly 40. L.S. was assaulted at about 4 a.m. whereas D.R. was assaulted at about 10:30 p.m. Further, the assault against L.S. occurred in the fall of 1998 and the assault against D.R. occurred in the spring of 1998. The assaults occurred some five miles apart, and neither assault occurred in the neighborhood where defendant lived. Although both women were kidnaped, L.S. was abducted at knifepoint and dragged into a nearby abandoned building whereas D.R. was abducted at gunpoint, ordered to get into a car and driven to an abandoned building several miles away from the site of her abduction.

The instant case is more analogous to *People v. Woltz*, 228 Ill. App. 3d 670, 592 N.E.2d 1182 (1992). In *Woltz*, this court concluded that *modus operandi* evidence was improperly admitted at trial because the similarities which existed among the sexual assaults committed against the victims, V.J. and J.S., were "common to many offenses of this type" and were "merely descriptive of the crime of aggravated criminal sexual assault." *Woltz*, 228 Ill. App. 3d at 675, 592 N.E.2d at 1186. The *Woltz* court further concluded that "[n]either the acts nor the circumstances under which they [the assaults] took place show sufficient similarities so as to establish *modus operandi*." *Woltz*, 228 Ill. App. 3d at 676, 592 N.E.2d at 1186. The evidence demonstrated that both victims were young girls only two years apart in age, who knew the defendant prior to the assault, visited his home, and stated that defendant "grabbed" them when initiating the assault. The evidence further established that both victims were vaginally penetrated; however, in one case defendant used his finger and in the other his penis. Additionally, one assault occurred on a public road as the defendant was walking with the victim towards his home while the other assault occurred in the defendant's home, specifically in his son's bedroom. Furthermore, one assault occurred in May 1989 whereas the other occurred in September 1989.

In this case, as in *Woltz*, D.R. and L.S. were assaulted at different times of the year, in different buildings located in different parts of the city. Further, the acts of sexual assault committed against the them, while sharing some similarities, were different. In this case, D.R. and L.S. testified that they were both forced to engage in vaginal sex with defendant; however, D.R. was also forced to engage in acts of oral sex.

We acknowledge that some similarities which existed in *Woltz* also exist in the case at bar. In *Woltz*, the evidence demonstrated that the defendant chose similar victims, specifically young girls with whom he was acquainted. In the case at bar, the evidence similarly demonstrated that the defendant chose a certain type of victim, specifically, African-American, adult females to whom defendant was a stranger. The choice-of-victim evidence in *Woltz*, however, was stronger than it is in the instant case because there the victims were only two years apart in age whereas, here, the victims are six years apart in age.

The relatively recent case of *People v. Howard*, 303 Ill. App. 3d 726, 708 N.E.2d 1212 (1999), is also instructive. In *Howard*, the defendant was charged with the offense of armed robbery, and during the course of his trial, evidence of another armed robbery was admitted to show *modus operandi*. The evidence established that the armed robberies were similar because both victims were white, male, college professors who were attacked on Van Buren Street in Chicago near the University of Illinois campus. Further, in each case, the assailant approached the victim from behind, displayed a handgun, demanded the victim's wallet and used the same profanity to address the victim. However, the assailant's conduct was dissimilar because only one victim was asked his "PIN" number for the automatic teller machine and the assailant used a vehicle to escape in only one instance. *Howard*, 303 Ill. App. 3d at 731-32, 708 N.E.2d at 1216-17. After considering the evidence, the *Howard* court concluded that the similarities between the offenses were insufficient to establish *modus operandi*. *Howard*, 303 Ill. App. 3d at 731, 708 N.E.2d at 1216.

■ Comparing *Howard* to the instant case, it becomes apparent that the facts of this case show far fewer similarities. Indeed, in *Howard*, the victims were the same race and gender, shared the same profession, were accosted on the same street in the same neighborhood, were both robbed at gunpoint and were both physically unharmed. In the instant case, although the race and gender characteristics of the victims were alike, the victims shared no other similarities, they were accosted in different neighborhoods, different weapons were used in each offense and defendant used his weapon to injure the victim in only one of the cases. Moreover, in *Howard*, the

defendant assaulted his victims in the same fashion on both occasions in that he walked up to them from behind and used the same profanity in addressing them. Here, defendant used entirely different approaches when abducting his victims in that he asked D.R. if he could accompany her before forcing her into his vehicle, but jumped out of the bushes and attacked L.S. from behind. Further, there was no indication that defendant spoke to D.R. and L.S. using the same words.

We are mindful that the assaults against D.R. and L.S. occurred in dirty, debris-filled abandoned buildings. Yet, as pointed out in oral arguments, sexual assaults are traditionally conducted in isolated areas, such as abandoned buildings, which are dirty and debris-filled by their very nature. The State further asserts that the presence of Nautica apparel in both cases tends to show *modus operandi*. We disagree. Indeed, there is no evidence suggesting that defendant stole coats from both victims or wore the same coat during both assaults. As pointed out, Nautica apparel is readily available, common and sold throughout the city and, therefore, is not distinct or unusual. For these reasons, we conclude that the trial court abused its discretion in allowing other crimes evidence to establish *modus operandi* where the purported similarities between the cases are not so distinctive when considered together as to earmark the alleged offenses as the handiwork of defendant. *Cf. People v. Hansen*, 313 Ill. App. 3d 491, 729 N.E.2d 934 (2000). Accordingly, we reverse the judgment of the trial court and remand this matter for a new trial. As our decision on this issue is dispositive, we need not address defendant's other claims of error. Nevertheless, we will address those claims of error that may arise upon remand.[1]

## Jury Instruction

■ Defendant contends that the trial court erred in refusing to give the jury a non-IPI instruction tendered by the defense which defined *modus operandi* as it was previously defined by the appellate court in *Kimbrough*, 138 Ill. App. 3d at 486, 485 N.E.2d at 1297, and in Black's Law Dictionary 1020 (7th ed. 1999). The State counters that the non-IPI instruction was properly refused by the trial court because IPI Criminal 4th No. 3.14, the instruction given, accurately stated the law. Moreover, the State argues that defendant's proposed instruction would have confused the jury and did not accurately reflect the current interpretation of the *modus operandi* exception as it was

---

[1] We decline to consider defendant's claims concerning the trial court's alleged consideration of defendant's failure to admit guilt or show remorse in sentencing.

set forth in *People v. Houston*, 240 Ill. App. 3d 754, 608 N.E.2d 46 (1992). We disagree with the State's contentions.

The purpose of jury instructions is to provide the jury with correct legal principles that apply to the evidence, thus enabling the jury to reach a proper conclusion based on the applicable law and the evidence presented in a case. *People v. Novak*, 163 Ill. 2d 93, 115-16, 643 N.E.2d 762, 773-74 (1994). In criminal cases, if an IPI instruction is available, "the IPI Criminal 2d instruction shall be used, unless the court determines that it does not accurately state the law." 134 Ill. 2d R. 451(a). However, if an IPI instruction does not properly state the law, a non-IPI instruction proffered by one of the parties in the case may be given on the subject, provided that the proffered instruction is simple, brief, impartial and free from argument. 134 Ill. 2d R. 451(a). It is within the sound discretion of the trial court to determine whether a non-IPI instruction should be given, and the trial court's determination will not be disturbed absent an abuse of that discretion. *People v. Simms*, 192 Ill. 2d 348, 412, 736 N.E.2d 1092, 1133 (2000). A trial court abuses its discretion in declining to give a non-IPI instruction when the jury is left to deliberate with instructions that are unclear, misleading or contain inaccurate statements of law. *In re Timothy H.*, 301 Ill. App. 3d 1008, 1015, 704 N.E.2d 943, 948 (1998).

In the instant case, the trial court instructed the jury on the issue of *modus operandi* evidence pursuant to IPI Criminal 4th No. 3.14, which provides:

"3.14 Proof Of Other Offenses Or Conduct

■ Evidence has been received that defendant[s] [(has) (have)] been involved in [(an offense) (offenses) (conduct)] other than [(that) (those)] charged in the [(indictment) (information) (complaint)].

■ This evidence has been received on the issue[s] of the [(defendant's) (defendants')] [(identification) (presence) (intent) (motive) (design) (knowledge) (_____)] may be considered by you only for that limited purpose.

■ It is for you to determine [whether the defendant[s] [(was) (were)] involved in [(that) (those)] [(offense) (offenses) (conduct)] and, if so,] what weight should be given to this evidence of the issue[s] of _____."

As is apparent from a reading of IPI Criminal 4th No. 3.14, the term *modus operandi* is not incorporated into the instruction or explicitly defined for the jury. In fact, the instruction does not use the term *modus operandi* but, instead, provides blanks where *modus operandi*, or any number of terms that are unspecified by the instruction, may be injected.

In this case, as previously noted, the trial court filled in the blanks with the term *modus operandi*. We recognize that IPI Criminal 4th No. 3.14 provides a vehicle by which juries can be instructed on the proper manner of considering other crimes evidence and that is has been used to instruct juries with respect to *modus operandi* evidence in the past. See *Novak*, 163 Ill. 2d at 116, 643 N.E.2d at 774 (where the defendant was charged with a sex offense against a child-victim and evidence was admitted regarding prior offenses committed by the defendant against children, IPI Criminal 4th No. 3.14 was used to instruct the jury on issue of *modus operandi*). We are also mindful that there are no cases which discuss the insufficiency of a *modus operandi* instruction that fails to define the term. However, we are compelled to conclude that, while it may be appropriate to insert the term *modus operandi* into IPI Criminal 4th No. 3.14 to instruct the jury on the proper method of considering other crimes evidence in deliberations, this instruction alone, given without defining the term *modus operandi*, is insufficient.

In oral arguments, the State contended that it is unnecessary to define *modus operandi* for the jury because lay jurors are acquainted with the meaning of the term through "common sense" and "common experience." We disagree with the State's assumption. Indeed, we cannot assume that jurors recognize and understand, through common sense or common usage, words borrowed from a foreign language (in this case Latin). We also cannot assume that jurors accurately recognize and apply legal terms of art that are embodied in a phrase borrowed from a foreign language. The State would appear to be relying on the assumption that jurors have been exposed to the term *modus operandi* through television and other mass media. However, we cannot assume that a technical term in a foreign language passes into common usage merely through unchartered media exposure. Many words borrowed from other languages and cultures may be utilized in media contexts at any given time. Words such as *chutzpah* from the Yiddish, *savoir-faire* from the French or *pere stroika* from the Russian may receive media play, but it takes more than some degree of contemporary media usage to permit a presumption that such foreign terms will be recognized and understood by every member of a jury picked randomly from the population.

That being said, we must now determine whether defendant has waived his objection to the trial court's judgment on this issue by failing to proffer an instruction that properly defined *modus operandi* for the jury. Defendant's instruction defined *modus operandi* as "a pattern of behavior so distinct that separate acts or conduct are recognized as the work of the same person." We note that *modus oper-*

*andi* is generally defined in this fashion in Illinois cases. See *People v. Wassell*, 321 Ill. App. 3d 1013, 1017, 748 N.E.2d 1269, 1272 (2001), quoting *People v. Denny*, 241 Ill. App. 3d 345, 358, 608 N.E.2d 1313, 1322 (1993) (defining *modus operandi* as " 'a pattern of criminal behavior so distinct that separate crimes are recognized as the work of the same person' "); *People v. Hansen*, 313 Ill. App. 3d 491, 506, 729 N.E.2d 934, 946 (2000) ("[t]he term *modus operandi* refers to a pattern of criminal behavior so distinctive that separate crimes committed in that pattern are recognizable as having been committed by the same person"); *People v. Knight*, 309 Ill. App. 3d 224, 227, 722 N.E.2d 331, 334 (1999) ("[i]t is also admissible to show the pattern of criminal behavior, or *modus operandi*, so distinct that separate crimes are recognized as the work of the same person"); *People v. Hall*, 235 Ill. App. 3d 418, 433, 601 N.E.2d 883, 895 (1992) ("[m]*odus operandi* refers to a method of working, a pattern of criminal behavior that is so distinct that separate crimes or wrongful conduct is recognized as being the work of the same person").

The State, however, asserts that this definition is outdated and that distinct behavior is no longer required to show *modus operandi*. In making this argument, the State relies on *People v. Houston*, 240 Ill. App. 3d at 764, 608 N.E.2d at 52, where this court followed the "trend" set in *People v. Taylor*, 101 Ill. 2d 508, 463 N.E.2d 705 (1984), *People v. Phillips*, 127 Ill. 2d 499, 538 N.E.2d 500 (1989), *People v. Bullock*, 154 Ill. App. 3d 266, 507 N.E.2d 44 (1987), and *People v. Watson*, 98 Ill. App. 3d 296, 424 N.E.2d 329 (1981), and held that "to qualify as *modus operandi*, the similarities between the crimes should outweigh the dissimilarities." The *Houston* court went on to conclude that, although there was no distinctive feature to the crimes at issue in that case, the crimes were "substantially similar," and therefore, *modus operandi* evidence was properly admitted. *Houston*, 240 Ill. App. 3d at 764, 608 N.E.2d at 52.

Many cases discuss the similarities and dissimilarities between offenses when determining the admissibility of *modus operandi* evidence. See *Phillips*, 127 Ill. 2d at 521-22, 538 N.E.2d at 508; *People v. Mitts*, 327 Ill. App. 3d 1, 15, 762 N.E.2d 590, 601-02 (2001); *Hansen*, 313 Ill. App. 3d at 506-07, 729 N.E.2d at 946-47; *Houston*, 240 Ill. App. 3d at 763, 608 N.E.2d at 51; *Woltz*, 228 Ill. App. 3d at 675-76, 592 N.E.2d at 1106; *Bullock*, 154 Ill. App. 3d at 269-71, 507 N.E.2d at 46-48; *Watson*, 98 Ill. App. 3d at 298-99, 424 N.E.2d at 331-32. However, contrary to the State's assertion, this discussion does not nullify the general definition of *modus operandi*. Indeed, courts define *modus operandi* in the same manner as defendant defined it herein and, at the same time, compare the similarities and dissimilarities between a

defendant's alleged conduct to determine whether the acts committed by a particular defendant depict conduct that, when considered in its entirety, shares distinctive features that earmark the crimes as the handiwork of one person. See *Mitts*, 327 Ill. App. 3d at 15, 762 N.E.2d at 601; *Hansen*, 313 Ill. App. 3d at 506, 729 N.E.2d at 946; *Houston*, 240 Ill. App. 3d at 763, 608 N.E.2d at 51; *Woltz*, 228 Ill. App. 3d at 675, 592 N.E.2d at 1186; *Bullock*, 154 Ill. App. 3d at 269, 507 N.E.2d at 46. Thus, the basic definition of *modus operandi* remains undisputed. For these reasons, we find that the defendant has not waived his right to an instruction based on the *modus operandi* definition he tendered at trial.

### Aggravated Kidnaping Incidental to Aggravated Criminal Sexual Assault

■ Defendant next asserts that his conviction for aggravated kidnaping should be vacated because the kidnaping was incidental to the sexual assault. In support of this contention, defendant argues that, in committing the instant offense, his "overriding motivation was sex and not to transport or carry D.R. to another location." Defendant further asserts that he should not have been convicted for aggravated kidnaping because the victim was not seriously injured as a result of the kidnaping and because the kidnaping only lasted for a short period of time.

The State counters that the elements of aggravated kidnaping are different than the elements of aggravated criminal sexual assault, and in this case, the elements of both offenses were proven beyond a reasonable doubt. The State also argues that the aggravated kidnaping was not "incidental" to the sexual assault because the asportation of the victim was carried out separately from the sexual assault and caused an independent danger to the victim. We agree.

Defendant was charged with the offense of aggravated kidnaping under section 10—2(a)(5) of the Illinois Criminal Code of 1961 (Code) (720 ILCS 5/10—2(a)(5) (West 1998)), which provides that aggravated kidnaping occurs when a person "[c]ommits the offense of kidnaping while armed with a dangerous weapon, as defined in Section 33A—1 of the 'Criminal Code of 1961.' " 720 ILCS 5/10—2(a)(5) (West 1998.)[2] The offense of kidnaping is defined by section 10—1 of the Code as:

> "§ 10—1. Kidnaping. (a) Kidnaping occurs when a person knowingly:
>
> (1) And secretly confines another against his will, or
>
> (2) By force or threat of imminent force carries another from

---

[2] A handgun is a dangerous weapon according to section 33A—1(b) of the Code. 720 ILCS 5/33A—1(b) (West 1998).

one place to another with intent secretly to confine him against his will, or

(3) By deceit or enticement induces another to go from one place to another with intent secretly to confine him against his will." 720 ILCS 5/10—1 (West 1998).

This court has previously articulated four factors to be considered when deciding whether asportation or detention is merely ancillary to the rape or whether it rises to the level of an independent crime of kidnaping. These factors include: (1) the duration of the asportation or detention; (2) whether the asportation or detention occurred during the commission of a separate offense; (3) whether the asportation or detention that occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense. *People v. Williams*, 263 Ill. App. 3d 1098, 1106, 638 N.E.2d 207, 213 (1994); *People v. Casiano*, 212 Ill. App. 3d 680, 687, 571 N.E.2d 742, 747 (1991).

In applying these factors to the instant case, it is apparent that defendant's conviction for aggravated kidnaping was proper. Here, the first factor is satisfied by evidence which demonstrated that defendant held the victim at gunpoint and forced her into his vehicle in the area of 48th and Indiana. He then drove her for several miles to an abandoned building at 8800 Dauphin and forced her inside the abandoned building. We recognize that there was no testimony in this case regarding the exact amount of time it took defendant to transport the victim from 48th and Indiana to 8800 Dauphin. However, it is well settled that "a kidnaping conviction is not precluded by the brevity of the asportation or the limited distance of the movement." *People v. Ware*, 323 Ill. App. 3d 47, 54, 751 N.E.2d 81, 88 (2001). Indeed, this court has previously held that an asportation of less than one block and a detention of a few minutes were sufficient to support a separate kidnaping conviction. See *People v. Riley*, 219 Ill. App. 3d 482, 489, 579 N.E.2d 1008, 1014 (1991); *People v. Pugh*, 162 Ill. App. 3d 1030, 1035, 516 N.E.2d 396, 400 (1987). In this case, the time and distance of the asportation exceeded those in the aforementioned cases.

The second factor of the test is likewise satisfied because D.R.'s asportation occurred prior to the sexual assault. This court has previously held that kidnaping constitutes a separate offense when the asportation occurred before, rather than during, a sexual assault. See *Ware*, 323 Ill. App. 3d at 56, 751 N.E.2d at 89, citing *People v. Lloyd*, 277 Ill. App. 3d 154, 164, 660 N.E.2d 43, 51 (1995) (asportation from street to abandoned building occurred prior to assault); *Casiano*, 212 Ill. App. 3d at 688, 571 N.E.2d at 747 (victim taken from street into

the defendant's apartment before being assaulted); *People v. Sherrod*, 220 Ill. App. 3d 429, 436, 581 N.E.2d 53, 57 (1991) (victim transported from street to garage prior to sexual assault).

Furthermore, as the third factor of the test requires, the asportation or detention of a victim is not an element of the offense of aggravated criminal sexual assault. See 720 ILCS 5/12—14 (West 1998). Thus, defendant committed a separate offense when he detained D.R. and transported her against her will to an abandoned building. Finally, in compliance with the fourth factor of the test, defendant's asportation of D.R. posed a significant danger that was independent of the sexual assault. As the facts demonstrate, defendant was armed with a gun when he drove D.R. to the abandoned building. Thus, D.R. was not only threatened with the prospect of sexual assault, but was also threatened with the prospect of death or injury. For these reasons, we conclude that the evidence was sufficient to sustain a conviction for aggravated kidnaping separate and apart from the offense of aggravated criminal sexual assault.

## CONCLUSION

For the foregoing reasons, we reverse defendant's convictions and sentences and remand this matter to the trial court for further proceedings in compliance with this opinion.

Reversed and remanded.

McBRIDE and CAHILL, JJ., concur.