2022 IL App (1st) 172032-U

FIFTH DIVISION
April 8, 2022

No. 1-17-2032

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| BABBAGE NET SCHOOL, INC., a corporation, | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | 16 L 10351 |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO, | ) | |
| | ) | |
| | ) | Honorable Patrick J. Sherlock, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Delort and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1     *Held:*  Trial court did not abuse its discretion when it refused to admit the facts to which plaintiff pled guilty in a federal criminal case to show *modus operandi*; plaintiff's witness did not open the door to evidence of the facts to which he pled guilty; trial court did not abuse its discretion when it refused to instruct the jury on fraudulent misrepresentation; affirmed.

¶ 2     After a trial, a jury found that defendant, the Board of Education of the City of Chicago

(Board), breached its contract with plaintiff, Babbage Net School, Inc. (Babbage). Babbage was

awarded damages of $375,620.27, which were later reduced to $354,358.75. On appeal, the Board contends that the trial court improperly refused to admit evidence of Babbage's nationwide scheme to defraud school districts. The Board asserts that the trial court should have (1) admitted the facts to which Babbage and its president/CEO, Kabir Kassam, pled guilty in a federal indictment as evidence of *modus operandi*, (2) allowed the Board to impeach Kassam with the facts to which he pled guilty, and (3) instructed the jury on the Board's affirmative defense of fraudulent misrepresentation. We affirm.[1]

¶ 3                                    I. BACKGROUND

¶ 4      In September 2014, Babbage filed a complaint for breach of a contract under which Babbage was paid to provide a tutoring program to students in Chicago Public Schools (CPS). Babbage alleged that the parties entered into the contract in October 2013, but the Board did not pay for all of the services provided, leaving a balance of over $354,000. The contract between Babbage and the Board, which was attached to the complaint, stated that the contract ran from October 23, 2013, to June 30, 2014, unless it was terminated sooner. If, at any time during the contract term, the Board determined that the services provided by Babbage were no longer in its best interest, the Board had "the option to terminate this Agreement on thirty (30) calendar days prior written notice to [Babbage] and the State Superintendent of Education." The Board also had the discretion to terminate the agreement on written notice to Babbage and the State Superintendent of Education when, in the opinion of the Board's Chief Teaching and Learning Officer, Babbage was unable to meet certain academic achievement goals and timetables.

---

[1] The Board's brief was filed on June 22, 2018. On September 25, 2018, this court entered an order granting the Board's motion to take the case on the Board's brief only. The case was not designated as ready until September 13, 2021. The court regrets this delay, which was not the fault of the author or panel members.

¶ 5    In its answer and affirmative defenses, the Board asserted that Babbage did not perform in accordance with the contract, and the Board was engaged in an authorized audit to prevent potential fraud. Because of allegations that Babbage engaged in fraudulent and illegal behavior relative to other, similar contracts, and because of a pending criminal indictment in the United States District Court for the Northern District of Illinois, the Board had requested detailed information for an audit. Because that information had not yet been tendered to the Board, Babbage's lawsuit was premature.

¶ 6    Babbage, Kassam, and others were indicted in federal court on April 24, 2014, several months before Babbage filed its breach of contract complaint. In part, the indictment stated as follows. Babbage and a subsidiary were approved as supplemental educational services (SES) providers in Illinois and 18 other states during the 2008-2009 and 2009-2010 school years. Beginning around July 2008 and through at least February 2012, Kassam and Babbage's director of operations, Jowhar Soultanali, fraudulently obtained over $33 million from more than 200 public school districts by misrepresenting the nature of the tutoring services provided by Babbage and its subsidiary, providing substandard materials, falsely inflating invoices, and creating and distributing false and misleading student progress and improvement reports. Babbage and Kassam caused a computer programmer to create programs that generated false progress reports and false pre- and post-test assessment scores for students. Kassam directed the programmer to configure the program so that the posttest scores were always higher that the pretest scores. In 2009, Babbage and Soultanali caused a billing administrator to create spreadsheets with false tutoring time summaries, which were then used to falsely bill school districts. When school districts questioned the fraudulent bills, Soultanali falsely stated that the overbilling was a mistake. Kassam, Soultanali, and others also paid state and school officials,

including in Texas and New Mexico, to obtain students, approve invoices, and obtain federal and state funds.

¶ 7    On August 23, 2016, Kassam and Babbage pled guilty in the federal case. In Cook County, the court denied the Board's motion to stay the breach of contract case until Kassam and Babbage were sentenced.

¶ 8    Before trial, the Board filed a motion *in limine* to allow testimony about Babbage's indictment and the allegations within the indictment. The Board stated that the allegations included the same tutoring services, billing and invoice practices, contracts, state and school approvals, and assessment exams that were provided to the Board. The Board withheld payment to Babbage because of the indictment, and the allegations showed that the Board was justified in not paying Babbage and its agents. In another motion *in limine*, the Board asserted that it should be able to present that Babbage and its agents pled guilty to the same exact type of services that were provided to CPS. The indictment listed Illinois as one of the states where Babbage and its agents conducted the same classes, sessions, and programs. The Board acknowledged that Kassam's and Babbage's guilty pleas related to schools in Texas and New Mexico.

¶ 9    At a subsequent hearing, the Board noted that the indictment did not involve CPS, but stated that the Board had the right to explain why it withheld payment, which was because the indictment was issued in April 2014 and the Board was waiting for an investigation. The Board stated that it would not pay money to a company that pled guilty to the same fraudulent practices that were provided to CPS. The Board asserted that it "should be able to tell the jurors: Hey, look, this is the SES program, the same exact one. Their billing purposes, their testing, the way they test these students, it's all exactly the same." Meanwhile, Babbage asserted that because "a conviction has been entered," Illinois Rule of Evidence 609 (eff. Jan. 1, 2011) applied, wherein a

prior conviction could be admitted for impeachment purposes. Babbage further stated that the subject acts occurred from 2008 and 2010 in Texas and New Mexico, and were unrelated to the issue at hand. The trial court queried whether the Board was trying to impute on Babbage the bad acts that took place in Texas and Mexico "without any demonstration that the same bad acts took place here." Ultimately, the Board was barred from referring to "the indictment and related criminal stuff, other than for purposes of impeachment under Rule 609." The Board could ask Babbage's witnesses if they were convicted of a crime, what the crime was, and what happened.

¶ 10    The matter proceeded to trial in March 2017. Among the witnesses who testified for Babbage was Nichole Matthews, who had been an SES coordinator for CPS. Her duties included comparing monthly invoices from vendors with invoices from a system called Cityspan to check if the two sets of invoices matched. Babbage also submitted a stack of information with start and end times for each student's tutoring sessions and students' scores. Matthews explained her process for checking the documentation for discrepancies, which largely involved spot checks due to the volume of data provided. Matthews recalled that her office started withholding payments to Babbage around March 2014 and Babbage provided services until June 30, 2014. Matthews never provided written notice to Babbage that they had defaulted on their contract duties.

¶ 11    Also testifying for Babbage was Heather Wendell, the executive director of the CPS grants office. Wendell explained that SES programming was a federal requirement under the No Child Left Behind Act, and was designed to provide tutoring services to qualifying low income students who were not meeting academic goals. Federal dollars were given to school districts to work with vendors, such as Babbage, that provided tutoring services. Wendell recalled that the normal protocol that her employees used to review Babbage's documentation from January to

June 2014 did not reveal anything that required further attention. The Board withheld payment starting in March 2014 "based on some information that the Board received that prompted us to withhold the payments in the best interest of the Board." Wendell asked another CPS employee, Amy Malave, to "actually try and go line by line through the data to see what the discrepancies or inconsistencies might be, if any."

¶ 12    Malave, who was an SES coordinator from 2008 to 2014, testified for the Board. Because the Board was withholding payment, Malave reviewed Babbage's raw data from March 2014 through June 2014 to support the data that Babbage had entered into Cityspan. Malave noticed that there were many scores of N/A and zero. The purpose of the SES program was for students to receive quality tutoring to increase their academic achievement, so it was expected that when students completed lessons, their resulting scores would be more than zero or N/A. According to Malave, there was nothing to indicate that a student received anything with a zero, and it was "very questionable what took place with the result of N/A." There were also many instances of students achieving scores of 95 to 100% in under three minutes.

¶ 13    According to Malave's analysis, for March 2014, Babbage provided a total of 4,305 hours and 17 minutes of services. Of those, there were 324 hours and 51 minutes of services that resulted in scores of N/A, 334 hours and 9 minutes that resulted in zero scores, and 50 hours and 23 minutes that resulted in scores of 95 to 100% in under three minutes. Malave also shared the hours and minutes for those categories for April, May, and June 2014. Malave stated that "by no means would we pay out even what that's reflected because it's misrepresenting time. There's a lot of discrepancies." Babbage's counsel objected, asserting that nothing in the evidence supported Malave's statement, and that Malave claimed "that data she can't understand is a misrepresentation." The objection was overruled.

¶ 14    On cross-examination, Malave acknowledged that she did not know how many questions a given student answered or those questions' level of difficulty. Malave agreed that the meaning of N/A was unknown. Babbage did not explain what a score of zero or N/A meant when it submitted its data. Malave also stated that the contract did not provide for a score that students were supposed to achieve. Malave recalled that Babbage signed yearly contracts with the Board from 2008 until 2013, which was the final contract before the SES program ended entirely. Babbage's contract with the Board was never terminated and Babbage provided services through the end of the 2013-2014 school year.

¶ 15    Among the exhibits presented at trial was a series of spreadsheets showing the lessons that students worked on during tutoring sessions, the date and length of each session, and the score on a corresponding test.

¶ 16    During a jury instruction conference, the Board submitted an instruction for the following affirmative defense: "Babbage Net School, Inc. failed to perform its obligation under the provider agreement and defrauded the Board of Education of the City of Chicago by misrepresenting the nature of tutoring services." The Board's proposed instructions also stated that Babbage "falsely misrepresented the nature of the tutoring services by creating false & misleading student progress and improvement reports, providing substandard educational materials to students and fraudulently billing schools." The Board asserted that the evidence of the Board being defrauded was from Malave's testimony, which showed there was "misrepresentation in how they billed, how they tested the students," such as the scores of zero. Pressed by the trial court to explain why the zero scores were a misrepresentation, the Board stated that the misrepresentation "is the billing purposes." The Board was supposed to be billed

for achieving increased scores and increasing students' academic levels, but that was not shown through the scores of N/A or zero.

¶ 17 The court found that the Board had not yet demonstrated any fraud based on the evidence so far. Per the court's review of the data, the N/A scores were "related to things that were probably just needed to be read. No testing was performed." The court also asked, "Well, does it mean that because they got a hundred on all the tests, except for the zeros, that they learned something but didn't learn one particular element?" Babbage "disclosed everything" and there was no indication that the timing was inaccurate or the tutoring was inadequate. That students may have performed poorly on some aspects did not mean that they were not tutored properly or that the tutoring was not done at all.

¶ 18 Returning to witness testimony, Kassam testified for Babbage that he pled guilty to a single count of mail fraud in 2016. Kassam recalled that Babbage's relationship with CPS started around 2006 or 2007. Students completed the tutoring program on laptops. Students took pretests in math, reading, English, language arts, and spelling, and received particular lessons depending on how they performed in those subjects. Kassam also explained the process that Babbage used for submitting invoices to the Board. When students finished a lesson or reached a certain point, data would be routed to Babbage's server. Babbage would "automatically scrape" the data, "without any human intervention," and put the data into Cityspan. Babbage would also provide backup data of when students signed in and out, their scores, and what they worked on. Babbage and CPS would discuss any adjustments, which were rare and generally in the amount of "a few hundred dollars here and there." Babbage also reported noninvoiceable hours, which were hours that students completed, but were over the number allowed under the contract. Babbage would not bill for those hours and would tell the Board:

"[H]ey, you know, even though *** I'm roughly adding here—we have provided $15,000 worth of services, you only pay for [$]8,000.

So we were very upfront and honest about that in saying *** we just want to let you know that we are providing you more services, but we cannot bill for that because, in some cases, either the student went over their 40 hours, or we couldn't bill for it because it was longer time, what have you. There must be many reasons that we could not bill for those times."

Kassam never received written notice from the Board that it was terminating the contract or that Babbage had defaulted on the contract.

¶ 19    On cross-examination, Kassam stated that his guilty plea had nothing to do with the three unpaid invoices. Kassam also stated that Babbage's tutoring programs were created for the entire SES program nationwide, not just Illinois. Classes were based on students, and not on states or districts. The Board's counsel asserted that Kassam had opened the door to asking about the indictment, but the court disagreed.

¶ 20    After the close of testimony, Babbage moved for a directed verdict. In response, the Board asserted that there was enough testimony to show that there were at least discrepancies and obligations that were not met under the contract. Those factual bases were for the jury to decide whether the contract was actually met by Babbage. The court took the matter under advisement. The court denied the Board's requested jury instruction on fraudulent misrepresentation, to which the Board preserved its objection.

¶ 21    While deliberating, the jury sent several questions, including the following: (1) "Can we please be provided some details surrounding Babbage Net School felony charge?", (2) What years was the mail fraud affecting?", and (3) "What occurred that led to the indictment of mail

fraud?" The trial court responded that the jury had all of the evidence that was provided and it was not entitled to additional information. The jury later returned a verdict in favor of Babbage, finding that Babbage proved that it performed its obligations under the contract, the Board breached the contract, and Babbage sustained damages from the beach. The jury awarded Babbage $375,620.27 in damages, which consisted of $354,358.75 in contract benefits and $21,261.52 in direct damages.

¶ 22    The Board filed a motion for a new trial, asserting that it was entitled to present evidence of Babbage's fraudulent business practices and the court improperly prevented the Board from asking Kassam about the basis for the guilty pleas. The Board stated that because Babbage used the same computer program and provided the same tutoring services to all school districts with which it contracted, the way that Babbage conducted business in Texas and New Mexico was relevant to the Board's claim that Babbage defrauded the Board. The Board's desired line of questioning would show that Kassam and Babbage conducted business in the same fraudulent manner with all the school districts with which they contracted. The Board further stated that Kassam opened the door to evidence of fraud. Also, because the Board presented some evidence of fraud, it was entitled to a jury instruction on that issue. Malave's testimony provided uncontroverted evidence that Babbage's data to the Board included misrepresentations. The Board also referred to an exhibit presented at trial that included reports about the amount of time students spent on tutoring lessons and the test scores they received. In addition, the Board requested a remittitur of $21,261 from the damages award, which was the difference between the jury's total damages award and the contract benefits or compensatory damages.

¶ 23    In response, Babbage stated in part that the trial court should not have allowed the Board to impeach Kassam with his guilty plea at all because Kassam had not yet been sentenced.

Babbage further asserted that the Board did not present any evidence of fraud at trial and the trial court properly declined a jury instruction on the issue. There was no evidence presented of the tests themselves, the contents of particular lessons, or how long each lesson was supposed to take.

¶ 24    On July 17, 2017, the trial court denied the Board's motion for a new trial. The court also entered an order that reduced the jury's award to $354,358.75, noting that Babbage had agreed to the remittitur.

¶ 25    The Board timely appealed.

¶ 26                                  II. ANALYSIS

¶ 27    On appeal, the Board raises three evidentiary errors that we will address in turn. Because Babbage has not filed an appellee's brief, our review is governed by *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976). There, our supreme court set forth three options that a reviewing court may exercise when there is no appellee's brief: (1) it may serve as an advocate for the appellee and decide the case when the court determines that justice so requires, (2) it may decide the merits of the appeal if the record is simple and the claimed errors are such that the court can easily decide them without an appellee's brief, or (3) it may reverse the trial court when the appellant's brief demonstrates *prima facie* reversible error that is supported by the record. *Id*. Here, we address the issues raised because they fall under the second category—the record is simple and the issues can easily be decided without an appellee's brief.

¶ 28                          A. Evidence of *Modus Operandi*

¶ 29    The Board first contends that the trial court abused its discretion when it refused to admit the facts to which Kassam and Babbage pled guilty as evidence of *modus operandi*. According to

the Board, the evidence at trial and the allegations that Kassam and Babbage admitted in the federal indictment show a pattern of criminal behavior that is so distinct that it could only have been committed by Babbage. The trial evidence and federal allegations all related to the same fraudulent enterprise that Babbage carried out against 200 school districts across the country. Further, the indictment detailed the precise fraudulent billing practices that were the subject of Malave's testimony. Babbage argues that the exclusion of evidence of the nationwide scheme to defraud school districts prevented the Board from explaining its decision to withhold payment on the contract after Kassam and Babbage were indicted.

¶ 30    In criminal cases, evidence of a defendant's prior acts of misconduct is inadmissible if only introduced to establish the defendant's propensity to commit crime. *Powell v. Dean Foods Co.*, 2013 IL App (1st) 082513-B, ¶ 88. "Propensity evidence is not rejected because it is irrelevant; 'on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudice one with a bad general record and deny him a fair opportunity to defend against a particular charge.' " *Thompson v. Petit*, 294 Ill. App. 3d 1029, 1034 (1998) (quoting *Michelson v. United States*, 335 U.S. 469, 475-76 (1948)). Evidence of other crimes is admissible where relevant to prove *modus operandi*, intent, identity, motive, or absence of mistake. *People v. Jackson*, 331 Ill. App. 3d 279, 285 (2002). Illinois has long subscribed to a similar rule in civil cases. *Powell*, 2013 IL App (1st) 082513-B, ¶ 89.

¶ 31    Even where the evidence of prior misconduct is relevant to prove something other than propensity, the trial court must still determine whether the danger of unfair prejudice substantially outweighs the probative value of the evidence. *Thompson*, 294 Ill. App. 3d at 1036. Whether to admit evidence is within the trial court's discretion, and its decision will not be disturbed unless there is an abuse of that discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12. A

trial court abuses its discretion when its ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the trial court's view. *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 23.

¶ 32    The indictment "and related criminal stuff," as described by the trial court, were admitted for purposes of impeachment under Illinois Rule of Evidence 609 (eff. Jan. 1, 2011). That rule provides that "[f]or the purpose of attacking the credibility of a witness," evidence that the witness has been convicted of a crime is admissible under certain circumstances. Ill. R. Evid. 609(a) (eff. Jan. 1, 2011). Here, Kassam's and Babbage's guilty pleas should not have been admitted under Rule 609 because sentencing had not yet occurred, and an unsentenced guilty plea is not a conviction for purposes of impeachment. *People v. Salem*, 2016 IL App (1st) 120390, ¶ 47. Babbage suggested that the evidence be admitted under Rule 609, and the jury found in its favor in any event, but we note this issue for the sake of completeness. See *People v. Harvey*, 211 Ill. 2d 368, 385 (2004) (a party may not request to proceed in one way and then later assert on appeal that the course of action was in error).

¶ 33    Turning to the Board's argument, *modus operandi* "refers to a pattern of criminal behavior so distinctive that separate crimes are recognized as the handiwork of the same person." *People v. Wilson*, 214 Ill. 2d 127, 140 (2005). Between the offense offered to prove *modus operandi* and the offense charged, there must be a clear connection that creates the logical inference that, if the party committed the former offense, he committed the latter offense as well. *Jackson*, 331 Ill. App. 3d at 286 (citing *People v. Berry*, 244 Ill. App. 3d 14, 21 (1991)). A higher degree of similarity is required between the facts of the crimes charged and the other offenses than when evidence is admitted to show intent, lack of accident or any other exception other than *modus operandi*. *Wilson*, 214 Ill. 2d at 140.

¶ 34    Barring the facts to which Babbage and Kassam pled guilty was not an abuse of discretion. The indictment mentioned Illinois in passing, as one of many states where Babbage was an approved SES provider. The conduct at issue in the indictment went through 2012, while the trial related to events that took place in the first half of 2014. Other than broad assertions, there was not any specific connection made before trial between Babbage's conduct as described in the indictment and its practices in CPS. The Board notes that motions *in limine* are subject to reconsideration by the court throughout the trial. *Cunningham v. Millers General Insurance Co.*, 227 Ill. App. 3d 201, 205 (1992). Still, it was not an abuse of discretion to find that additional testimony did not support admitting the Board's desired evidence to show *modus operandi*. Malave stated that many students had scores of zero and N/A, but there was no testimony about what those scores meant. The trial court noted that scores of zero could indicate that students did not learn a particular element, and stated that scores of N/A were related to topics where no testing was performed. Kassam testified about Babbage's billing and testing process generally, but his testimony did not draw parallels to the facts in the indictment. Kassam stated that Babbage put data into the CPS system "without any human intervention," and adjustments were made as necessary. There was no testimony about the mechanics of Babbage's billing in CPS such that a clear connection could be made between the allegations in the federal indictment and Babbage's billing and testing practices in CPS.

¶ 35    The Board also asserts that the jurors' questions about the federal fraud charge indicate that the exclusion of the facts to which Kassam and Babbage pled guilty affected the verdict. It is equally plausible that the jurors' questions illustrate the tendency of prior bad acts evidence to "overpersuade the fact finder." *Timothy Whelan Law Associates, Ltd. v. Kruppe*, 409 Ill. App. 3d 359, 370 (2011). Even the limited mention of Kassam's guilty plea prompted multiple questions

from the jury. The trial court's decision to bar evidence of the fraud allegations to show *modus operandi* was not arbitrary or unreasonable.

¶ 36    The Board further contends that Kassam's testimony opened the door to evidence of Babbage's fraudulent practices, and when that occurred, the trial should have allowed the Board to impeach Kassam with the facts to which he pled guilty. According to the Board, Kassam misled the jury when he testified that Babbage was "open and honest" in its billing practices and provided targeted tutoring for students based on pretests. The Board argues that Kassam's testimony blatantly contradicted the federal factual allegation that he falsely inflated invoices to fraudulently obtain over $33 million from more than 200 school districts. The Board also states that Kassam's testimony conflicted with the federal factual allegation that he created a computer program that generated false pretest scores and configured that program to provide data showing that posttest scores were always higher than pretest scores.

¶ 37    A party can open the door to the admission of evidence that would be inadmissible under ordinary circumstances. *People v. Harris*, 231 Ill. 2d 582, 588 (2008). Still, this court "gives great deference to the trial court's interpretation of a witness's testimony" and to the trial court's finding of whether a party indeed opened the door to certain evidence by misleading the jury. *Id*. at 590-91. Here, the trial court's finding that Kassam did not open the door to evidence of Babbage's fraudulent practices was based on a reasonable interpretation of Kassam's testimony. Kassam testified that Babbage was "very upfront and honest" when it did not bill the Board for hours that exceeded the number of hours allowed under the contract. This was a single aspect of Babbage's billing practices that was not mentioned in the indictment. Kassam did not testify that Baggage was upfront and honest about its invoicing generally. Kassam testified that students took a pretest and received particular lessons depending on their scores. Kassam did not testify

-15-

about those tests' accuracy or refer to posttests. Here, too, the court could reasonably conclude that Kassam did not contradict the allegations in the federal indictment.

¶ 38                                      B. Jury Instruction

¶ 39    Lastly, the Board contends that it presented some evidence of fraud, and the trial court improperly refused to instruct the jury on fraudulent misrepresentation. The Board points to Malave's testimony, where she stated that the Board would not have paid for entries for scores of zero or scores of 95 to 100% on tests in fewer than three minutes. The Board argues that students' receiving almost 800 hours of tutoring, but not being able to correctly answer a question on that material, was some evidence of fraudulent misrepresentation. The Board refers to Babbage's practice, seen in data submitted at trial, of billing the Board for students to take the same test multiple times. The Board further notes that the trial court denied Babbage's motion for a directed verdict and overruled Babbage's objections to Malave's testimony.

¶ 40    Generally, litigants have the right to have the jury instructed on each theory supported by the evidence. *Garcia v. Goetz*, 2018 IL App (1st) 172204, ¶ 28. There need be only "some evidence in the record" to justify the theory of an instruction. *LaFever v. Kemlite Co.*, 185 Ill. 2d 380, 406 (1998). "The evidence may be slight; a reviewing court may not reweigh it or determine if it should lead to a particular conclusion." *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995). While the threshold for permitting an instruction is low, the standard for reversing a judgment based on failure to give an instruction is high. *Heastie v. Roberts*, 226 Ill. 2d 515, 543 (2007). The decision whether to give or deny a jury instruction is within the trial court's discretion. *Mobley v. TramCo Transmission, Inc.*, 2014 IL App (1st) 122123, ¶ 23. We will not disturb the trial court's decision unless it abused its discretion, and a new trial will be

granted only when the refusal to give a tendered instruction seriously prejudiced a party's right to a fair trial. *Heastie*, 226 Ill. 2d at 543.

¶ 41    The trial court did not abuse its discretion when it denied the instruction. Malave's testimony about the zero scores, N/As, and scoring 95 to 100% in under three minutes, as well as the billing for multiple student attempts, did not, by itself, point to fraud. Malave's testimony raised questions about the quality of Babbage's tutoring, but as the trial court noted, Babbage disclosed all of the information that informed Malave's testimony. While only some evidence is needed to justify an instruction, "inherently that evidence must be reliable and grounded in more than mere possibilities." *LaFever*, 185 Ill. 2d at 408. The Board's request for a fraudulent misrepresentation instruction was based on conjecture, which is not a sufficient basis for reversing the trial court's decision.

¶ 42    Further, that the court overruled Babbage's objection to Malave's testimony and denied a directed verdict does not mean that the trial court agreed there was some evidence of fraud. Overruling an objection does not indicate that the court agreed that sufficient evidence of fraudulent misrepresentation had been presented. The trial court denied the instruction after considering all of the evidence. Further, the Board's argument against the directed verdict related to whether Babbage performed under the contract, and the denial of the directed verdict could have been because there was evidence that Babbage did not perform. See *Carlson v. Rehabilitation Institute of Chicago*, 2016 IL App (1st) 143853, ¶ 13 (to establish breach of contract, a plaintiff must prove existence of a valid and enforceable contract, performance by the plaintiff, breach of the contract by the defendant, and damages resulting from the breach).

¶ 43                          III. CONCLUSION

¶ 44    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 45    Affirmed.